United States District Court
District of Connecticut

FILED

Donald Quirk, Plaintiff, Plaintiff ,
        pro se (96936)

2004 JAN -6 Case No. 3:02CV1729 (DJS)

US DISTRICT COURT
BRIDGEPORT CT

Marilyn Stuart, M.D. (Official and Individual Capacities),
    Defendant

January 2, 2004

### Declaration of Plaintiff Regarding Use of Radiological Agents at CVH

Pursuant to 28 U.S.C. 1746, I make this declaration under penalty of perjury.

Attached to this Declaration as Exhibits are excerpts from two books describing the use of

Chemical and Radiological agents. One is from the U.S. Senate and describes the surreptitious use

of chemical and radiological agents against American citizens. The U.S. Senate Report documents

the use of these agents against American citizens.. The second exhibit is from a book called "The

Agency" by John Ranelagh and it describes and documents the development of these Mind Control

Devices as understood by the author. Further, the Senate Report, of which these excepts are a part,

specifically describes the surreptitious use of chemical agents against unwitting and unwilling

patients at state mental health facilities, and gives examples of this. The Plaintiff is a patient at a

State mental health facility. (Some of the patients who were victims of these agents died.)


The defendants in this case have been using radiological agents, and other mind control techniques

against me surreptitiously, and without my permission. This has immobilized my ability to

effectively pursue this law suit. They have also used these devices to torture me. The Senate

established and documented several instances where chemical and other agents were used against

patients in state mental health facilities, as stated above.

1

One of the reasons that the state is using these radiological agents against me is that I am a

"political prisoner" at this hospital, as documented prior filings.

I declare under penalty of perjury the above facts are true and are based upon my own knowledge.

Donald Quirk
Merritt Hall
351 Silver St.
Middletown, Ct. 06457
(860) 685-9741

Date: 1/2/04

## Certification

Donald Quirk declares under penalty of perjury that he dropped a copy of this Document in the mail on January 2, 2004, first class postage prepaid, addressed to Daniel Shapiro, AAG, P.O. Box 120, Hartford, Ct. 06141.

Signed: _____    Date: 1/2/04

2

| 94TH CONGRESS | | SENATE | | REPORT |
|---|---|---|---|---|
| 2d Session | | | | No. 94-755 |

Chairman of the Senate Select Committee
Operations With Respect to Intelligence

# FOREIGN AND MILITARY
# INTELLIGENCE

## BOOK I

### FINAL REPORT

OF THE

## SELECT COMMITTEE
## TO STUDY GOVERNMENTAL OPERATIONS

WITH RESPECT TO

## INTELLIGENCE ACTIVITIES
## UNITED STATES SENATE

TOGETHER WITH

## ADDITIONAL, SUPPLEMENTAL, AND SEPARATE
## VIEWS



APRIL 26 (legislative day, APRIL 14), 1976

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1976

69-983 O

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $5.35

Exhibit A

# XVII. TESTING AND USE OF CHEMICAL AND BIOLOGICAL AGENTS BY THE INTELLIGENCE COMMUNITY[1]

Under its mandate, the Select Committee has studied the testing and use of chemical and biological agents by intelligence agencies. Detailed descriptions of the programs conducted by intelligence agencies involving chemical and biological agents will be included in a separately published appendix to the Senate Select Committee's report. This section of the report will discuss the rationale for the programs, their monitoring and control, and what the Committee's investigation has revealed about the relationships among the intelligence agencies and about their relations with other government agencies and private institutions and individuals.[2]

Fears that countries hostile to the United States would use chemical and biological agents against Americans or America's allies led to the development of a defensive program designed to discover techniques for American intelligence agencies to detect and counteract chemical and biological agents. The defensive orientation soon became secondary as the possible use of these agents to obtain information from, or gain control over, enemy agents became apparent.

Research and development programs to find materials which could be used to alter human behavior were initiated in the late 1940s and early 1950s. These experimental programs originally included testing of drugs involving witting human subjects, and culminated in tests using unwitting, nonvolunteer human subjects. These tests were designed to determine the potential effects of chemical or biological agents when used operationally against individuals unaware that they had received a drug.

The testing programs were considered highly sensitive by the intelligence agencies administering them. Few people, even within the agencies, knew of the programs and there is no evidence that either the executive branch or Congress were ever informed of them. The highly compartmented nature of these programs may be explained in part by an observation made by the CIA Inspector General that, "the knowledge that the Agency is engaging in unethical and illicit activi-

---

[1] Senate Resolution 21 directs the Senate Select Committee on Intelligence Activities to investigate a number of issues:

"(a) Whether agencies within the intelligence community conducted illegal domestic activities (Section 2(1) and (2));

"(b) The extent to which agencies within the intelligence community cooperate (Section 2(4) and (8));

"(c) The adequacy of executive branch and congressional oversight of intelligence activities (Section 2(7) and (11));

"(d) The adequacy of existing laws to safeguard the rights of American citizens (Section 2(13))."

[2] The details of these programs may never be known. The programs were highly compartmented. Few records were kept. What little documentation existed for the CIA's principal program was destroyed early in 1973.

(385)

386

ties would have serious repercussions in political and diplomatic circles and would be detrimental to the accomplishment of its missions." [3]

The research and development program, and particularly the covert testing programs, resulted in massive abridgments of the rights of American citizens, sometimes with tragic consequences. The deaths of two Americans [3a] can be attributed to these programs; other participants in the testing programs may still suffer from the residual effects. While some controlled testing of these substances might be defended, the nature of the tests, their scale, and the fact that they were continued for years after the danger of surreptitious administration of LSD to unwitting individuals was known, demonstrate a fundamental disregard for the value of human life.

The Select Committee's investigation of the testing and use of chemical and biological agents also raise serious questions about the adequacy of command and control procedures within the Central Intelligence Agency and military intelligence, and about the relationships among the intelligence agencies, other governmental agencies, and private institutions and individuals. The CIA's normal administrative controls were waived for programs involving chemical and biological agents to protect their security. According to the head of the Audit Branch of the CIA, these waivers produced "gross administrative failures." They prevented the CIA's internal review mechanisms (the Office of General Counsel, the Inspector General, and the Audit Staff) from adequately supervising the programs. In general, the waivers had the paradoxical effect of providing less restrictive administrative controls and less effective internal review for controversial and highly sensitive projects than those governing normal Agency activities.

The security of the programs was protected not only by waivers of normal administrative controls, but also by a high degree of compartmentation within the CIA. This compartmentation excluded the CIA's Medical Staff from the principal research and testing program employing chemical and biological agents.

It also may have led to agency policymakers receiving differing and inconsistent responses when they posed questions to the CIA component involved.

Jurisdictional uncertainty within the CIA was matched by jurisdictional conflict among the various intelligence agencies. A spirit of cooperation and reciprocal exchanges of information which initially characterized the programs disappeared. Military testers withheld information from the CIA, ignoring suggestions for coordination from their superiors. The CIA similarly failed to provide information to the military on the CIA's testing program. This failure to cooperate was conspicuously manifested in an attempt by the Army to conceal

[3] CIA Inspector General's Survey of TSD, 1957, p. 217.

[3a] On January 8, 1953, Mr. Harold Blauer died of circulatory collapse and heart failure following an intravenous injection of a synthetic mescaline derivative while a subject of tests conducted by New York State Psychiatric Institute under a contract let by the U.S. Army Chemical Corps. The Committee's investigation into drug testing by U.S. intelligence agencies focused on the testing of LSD, however, the committee did receive a copy of the U.S. Army Inspector General's Report issued on October, 1975, on the events and circumstances of Mr. Blauer's death. His death was directly attributable to the administration of the synthetic mescaline derivative.

(388)

CIA resources, however, went into the clandestine operations and covert activities carried out by the Directorate of Plans. While about 20 percent of the agency's budget and 40 percent of the agency's personnel were involved in research, analysis, reporting, and administration, the remaining 80 percent of the budget and 60 percent of the people were involved in the Directorate of Plans.[25]

Nearly all the activities that would later embarrass the CIA began during the Bedell Smith period, under the auspices of the Directorate of Plans. With the acceptance by the Department of State of Smith's control over Frank Wisner and OPC in October 1950, the agency assumed full responsibility for covert operations. It now had two clear purposes: to prepare National Intelligence Estimates and to conduct extradiplomatic activity worldwide. NSC 68 gave the agency additional support for these activities. It consisted of a series of decisions framing the policy of containment of the Soviet Union and its allies. It represented a summing up of the perceived Soviet threat and the steps that would be taken to deal with it. The Soviet Union was not superhuman, and it could be restrained by resolute opposition at all levels—political, economic, diplomatic, clandestine—and by clearly signaling that the United States would use its military strength to counter further Soviet encroachments if need be.[26] Along with the Korean War, this directive had a massive effect on American military procurement, increasing appropriations for defense from about $15 billion in 1950 to about $50 billion two years later. Part of this increase went straight to the CIA for espionage and covert operations of all sorts, some on a very large scale.

## MIND CONTROL

One of the first fruits of Smith's merger of the OPC and OSO was a group of projects known from 1953 as MKUltra. Most of the projects dealt with drug or counterdrug research and development; they had been prompted by a CIA analysis of confessions in Stalin's show trials and in particular by the public "confession" of Cardinal Mindszenty of Hungary on February 3, 1949. Mindszenty was obviously a broken man when he confessed, and the CIA was interested in how he had been broken. As the Korean War progressed and a few captured American servicemen began to make radio propaganda broadcasts for the communists and to sign statements calling for an end to U.S. involvement in the war, senior CIA people concluded that the Soviets had perfected a way of capturing the minds and the wills of people, thus making them utterly responsive to Soviet commands. People really were standing up in communist courts and admitting to the most extraordinary charges. It was a phenomenon that the agency investigated in detail.

This was a period when the horror of the Nazi death camps was recent and in everyone's mind, and it seemed to many of the best and brightest in

*Exhibit B*

U.S. government service that another, similar, totalitarian threat faced the world. Just as the previous generation of people in power had come to terms with the mass bombing of civilians, the new generation had to face up to the prospect of ever more refined technical evils. Being involved in this way showed the CIA to be in the context of its time, sharing the concerns of society, not removed from them.[27] These concerns were reflected in the following CIA analysis:

> Since the notorious Moscow trials of 1937, overt Russian judicial procedure has been noteworthy for the dramatic trials in which the defendants have exhibited anomalous and incomprehensible behavior and confessions. Characteristics and manner of the defendants, and formulation and delivery of the confessions, have been so similar in a large number of cases as to suggest factitious origin. Most noteworthy and incredible has been the recent "confession" of His Eminence Cardinal Mindszenty while on trial in the People's Court of Hungary. . . .
>
> The evident incongruities prompted this study. . . . It became apparent at the outset of the study that the style, context and manner of delivery of the "confessions" were such as to be inexplicable unless there had been a reorganization and reorientation of the minds of the confessees. There is adequate historical experience to establish that basic changes in the functional organization of the human mind cannot be brought about by the traditional methods of physical torture—these, at the most, achieve a reluctant, temporary yielding and, moreover, leave their mark upon the victim. Newer or more subtle techniques had, therefore, to be considered . . . :
>
> a. Psychosurgery: a surgical separation of the frontal lobes of the brain.
> b. Shock method: (1) electrical (2) drug: metrazol, cannabis, indica, insulin, cocaine.
> c. Psychoanalytic methods: (1) psychoanalysis (2) narcoanalysis and synthesis (3) hypnoanalysis and synthesis.
> d. Combinations of the foregoing.[28]

For the next twenty-three years, under one name or another, the CIA was involved in researching ways of controlling human behavior.[29] The first effort was named Project Bluebird.

During World War II the OSS conducted drug experiments, including one for a "truth drug" with cannabis. Military hospitals had noticed that some anesthetics made soldiers speak freely while they were unconscious. The first field test was carried out on an unsuspecting underworld figure, August Del Gracio, a member of the Charles "Lucky" Luciano crime family in New York. Del Gracio was involved with the OSS attempt to arrange, through Luciano, underworld Italian-American help in preparing the way for the invasion of Sicily and for the protection of New York docks and shipyards against enemy sabotage. He was given a number of cigarettes heavily laced with cannabis, and as he smoked them he was questioned about underworld activities to see how